**John Edward GERMAIN, Petitioner,**

v.

**Norman BUTLER, et al., Respondents.**

Civ. A. No. 86–3671–K.

United States District Court,
D. Massachusetts.

June 23, 1988.

Maureen B. Brodoff, Committee for Public Counsel Services, Boston, Mass., for petitioner.

Sandra L. Hautanen, Asst. Atty. Gen., Criminal Bureau, Boston, Mass., for respondents.

## MEMORANDUM AND ORDER

KEETON, District Judge.

Petitioner John Edward Germain was convicted in state court on four counts of armed robbery while masked and four counts of stealing by confining or putting in fear. He has petitioned for habeas corpus relief pursuant to 28 U.S.C. § 2254 on the ground that his convictions deprived him of due process because the evidence upon which the jury convicted him was constitutionally insufficient under the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner exhausted his state remedies by raising this issue on direct appeal to the Massachusetts Supreme Judicial Court ("SJC"). *See Commonwealth v. Germain*, 396 Mass. 413, 486 N.E.2d 693 (1985). The SJC affirmed petitioner's convictions, rejecting the argument petitioner makes here, as well as his arguments that his motion to suppress should have been granted and that the prosecutor's opening statement was improper.

### I. *Summary of the Evidence at Trial*

On April 5, 1980, at around 10:00 a.m., John Coburn, the manager of a Worcester Zayre store, was in his office doing paperwork (T.Tr. at 42–43). He saw a person approaching wearing a light brown suede mask and pointing a small gun at him (T.Tr. at 43). The man asked Coburn where his daily receipts were, and Coburn told him they were downstairs in the cash office (T.Tr. at 43). They proceeded to the cash office, picking up two other employees, Sidney Cusack and Patricia Carabba, along the way (T.Tr. at 43–44, 95). Two other employees, Elizabeth Bouthiette and Donna Degnis, were in the cash office when they arrived (T.Tr. at 46, 106–07, 124). Holding the five Zayre employees at gunpoint (T.Tr. at 47, 97–98, 126), the rob-

ber found a box in which he had the employees place the bags of money that were in the cash office (T.Tr. at 47–49, 96–98, 109, 124–25). The bags contained store receipts consisting of money in all denominations including change (T.Tr. at 48, 72, 96). The robber then proceeded to the safe room off the cash office and emptied an unlocked safe of the petty cash funds stored inside (T.Tr. at 49–50, 98, 109, 126–27). The total amount taken was $16,000 (T.Tr. at 90). He then pulled the cord of a phone in the cash office, told the employees to remain in the safe room and left (T.Tr. at 51–52, 98, 109, 127). After waiting five minutes, the employees left the safe room (T.Tr. at 110, 127), pushed the store alarm and called the police (T.Tr. at 52–53, 98, 110).

The robber was masked throughout the robbery (T.Tr. at 108, 135). At trial, he was described as having been about 5'10" or 5'11" (T.Tr. at 112, 125), of slim build (T.Tr. at 112) and having brown eyes (T.Tr. at 108). A photograph of petitioner taken on the day of the arrest was admitted into evidence as Exhibit 17 (T.Tr. at 139, 188–90). Viewing the evidence in the light most favorable to the prosecution, the jury could have concluded that petitioner's appearance in the photograph and/or in court matched this description.

The four Zayre employees who testified at trial identified a mask, hat, gloves, jacket, sneakers and gun as items which were used or similar to those used by the robber. These items had been seized during a search conducted at 10:00 p.m. on April 8, 1980, of a first floor apartment located at 9 Barclay Street (T.Tr. at 166–68). The jacket, hat, gloves, mask and sneakers were found along with another mask, pair of gloves and a duffle bag behind a false wall in a closet adjacent to the living room (T.Tr. at 169–72, 176). The gun, together with another gun, some ammunition and a cartridge magazine, were found in the bedroom under some styrofoam (T.Tr. at 173–75, 179). Ammunition was also found in the kitchen cabinet (T.Tr. at 174, 180). No one was present in the apartment when the

police executed the warrant (T.Tr. at 167–68), and the apartment was not furnished (T.Tr. at 168).

According to the testimony of the owner of 9 Barclay Street, Amy Antinarella, Germain and his girlfriend, Diane Pacek, rented the apartment on April 5, 1980, the day of the robbery (T.Tr. at 136–38). Shortly after noon on that day, Antinarella met Germain and Pacek by appointment at the apartment (T.Tr. at 138, 146–47). Pacek, who knew Antinarella, introduced Germain and gave her an envelope with Germain's name on it containing two months rent in the amount of $250 (T.Tr. at 137–38, 141–43). Antinarella gave Germain and Pacek a key to the apartment and they indicated that they were going to move a few things in right away (T.Tr. at 147–48). They were not going to move in and live in the apartment, however, until April 17 (T.Tr. at 143, 147–48). In the interim, painting and other work was to be done on the interior of the apartment by member of Pacek's family (T.Tr. at 143, 148–49). Antinarella testified that the workmen went in and out of the apartment nearly every day after April 5, 1980 (T.Tr. at 143–44). However, she also testified that she did not actually see anyone at the apartment between April 5 and April 8 (T.Tr. at 144–46) and that she did not provide anyone but petitioner and Pacek with a key (T.Tr. at 148). Therefore, the evidence that others had access to the apartment during the relevant time period was equivocal at best.

According to respondents:

The evidence also showed that two hours after the robbery, petitioner Germain paid his landlady two months rent, $250.00, in cash. *The landlady observed a large quantity of currency in the petitioner's wallet, and she also observed the petitioner give his girlfriend $450.00 in cash to purchase dining room furniture from the landlady's daughter. Germain at 416–17 [486 N.E. 2d 693].* This evidence is consistent with a finding that the petitioner had cash in hand because he had earlier that day emptied the Zayre safe of petty cash and banded bills. *Id.* at 415 [486 N.E.2d 693].

Opposition to Petitioner's Memorandum of Law in Support of Petition for Habeas Corpus (Docket No. 23) at 6.

Respondents are correct that the underlined portion was discussed in the SJC's opinion. However, the SJC only refers to this evidence as being part of the search warrant affidavit in the context of reviewing the denial of petitioner's suppression motion. The SJC does not refer to this evidence in reviewing the sufficiency of the evidence against petitioner or indicate that this evidence was before the jury. As the quoted excerpt from the Respondents' Memorandum in Opposition shows, respondents have not pointed to the place in the record where they contend this evidence was admitted. I have been unable to locate any reference to this evidence in the trial transcript. Because it was not presented to the jury which convicted petitioner, this evidence cannot be considered in reviewing the sufficiency of the evidence under *Jackson.*

Likewise, respondents contend that the witnesses described the robber as having "brown curly hair extending about three inches below his mask." Respondents' Memorandum in Opposition at 5. The SJC also mentions this description in summarizing the facts of the robbery. *Germain,* 396 Mass. at 414, 486 N.E.2d at 694. This information *was* part of the search warrant affidavit. *See* Amended Brief and Record Appendix for the Defendant on Appeal from the Worcester County Superior Court at 6. However, a review of the trial transcript shows that no witness testified concerning the robber's hair and, therefore, this information is also irrelevant to the sufficiency of the evidence inquiry.

## II. Sufficiency of the Evidence

The following is the SJC's discussion of petitioner's insufficiency of the evidence argument:

The defendant moved for a required finding of not guilty and the judge denied the motion. The defendant argues the circumstantial evidence was insufficient to support a finding of guilty beyond a reasonable doubt. The defendant contends

that the evidence linking him with the robbery is too tenuous, since there is no identification of the robber, and too speculative, because others had access to the apartment where the items from the robbery were found.[8] "It is not necessary to prove that no one other than the accused could have done the act.... That another might have had the opportunity to do the act goes only to the weight of the evidence." *Commonwealth v. Lussier*, 364 Mass. 414, 421, 305 N.E.2d 499 (1973), quoting *Commonwealth v. Medeiros*, 354 Mass. 193, 197, 236 N.E.2d 642 (1968). The weight of the evidence is a jury question. *See Commonwealth v. Swartz*, 343 Mass. 709, 713, 180 N.E.2d 685 (1962).

[8] The defendant rented the apartment on the fifth of April for two months commencing April 1. On April 8 the apartment was unoccupied. From April 5 through April 8 the defendant, his girl friend, and various members of his girl friend's family cleaned and painted the apartment.*

*Germain*, 396 Mass. at 418–19, 486 N.E.2d at 697.

Petitioner argues that, although there is nothing incorrect in the SJC's statement of the law, their analysis is incomplete because the SJC did not take the additional step of testing the sufficiency of the evidence under the *Jackson* standard. The First Circuit explained the *Jackson* standard in *Joseph v. Fair*, 763 F.2d 9 (1st Cir.1985):

> Under *Jackson*, a state conviction must be reversed if, after viewing the evidence in the light most favorable to the prosecution, a court finds that no rational trier of fact could have found, beyond a reasonable doubt, sufficient evidence of the crime for which the defendant was convicted.

*Id.* at 10.

Petitioner cites *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir.1982): "If [*Jackson's*] beyond a reasonable doubt standard is to have any meaning, we must assume that when the choice between guilt and inno-

cence from 'historical' or undisputed facts reaches a certain degree of conjecture and speculation, then the defendant must be acquitted." Petitioner contends that the evidence against him forms a chain of circumstantial evidence so weak that in order to conclude that petitioner was the man who robbed the Zayre store a rational jury would be forced to engage in speculation about petitioner's guilt to a degree inconsistent with due process. Specifically, petitioner argues that his convictions rested on the unconstitutionally speculative inferences that, because the petitioner fit the very general description of the robber and was one of several people having access to the Barclay Street apartment, he must have placed the incriminating items there, and therefore, must have been the robber.

Petitioner acknowledges that the inference linking him to the incriminating items would not be unreasonably speculative if he had been living in the apartment or had exclusive control over it. *See United States v. Johnson*, 563 F.2d 936, 941–42 (8th Cir.1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 746, 54 L.Ed.2d 768 (1978) (inference of exclusive possession of proceeds of bank robbery permissible where the money was found in home occupied only by defendant, his wife and their minor children and there was no evidence indicating that money was brought into house by someone else between robbery and seizure). However, petitioner argues that, because he merely had joint legal possession of the apartment and access to it along with the people working there, the inference linking him to the items is extremely speculative and, even when combined with the other evidence against him, does not provide sufficient basis for a rational trier of fact to conclude, beyond a reasonable doubt, that petitioner committed the robbery.

■ Respondents cite the statement in *United States v. Smith*, 680 F.2d 255, 259 (1st Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983), that "if the evidence can be construed in various

* Petitioner correctly points out that there was no evidence that he and Pacek cleaned and painted the apartment. Nevertheless, there was evi-

dence that they had access to the apartment because Antinarella gave them a key on April 5 (T.Tr. at 148).

reasonable alternatives, the jury is entitled to freely choose from among them." Respondents argue that, because petitioner admits that either he or the workmen could have easily put the items in the apartment, the jury chose among "reasonable alternatives" in finding petitioner guilty of the robbery.

This analysis is flawed to the extent that it ignores the due process limits of *Jackson* in defining "reasonable alternatives." *Jackson* means that for petitioner's guilt to be a "reasonable alternative" it must be one that a rational person could believe beyond a reasonable doubt, not merely one that a rational person would not find unreasonable. *Smith* itself says that "[t]he Government may prove its case entirely by circumstantial evidence and need not exclude every reasonable hypothesis of innocence, *provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt.*" *Smith*, 680 F.2d at 259 (emphasis added). *Smith* and *Jackson* together mean that if the jury is presented with various alternatives, and a rational person could believe beyond a reasonable doubt one of the alternatives that supports the criminal charge, then the jury is free to choose that alternative over the others. A jury is not free, however, to choose among various alternatives all of which are "reasonable" only in the sense that they are not unreasonable and none of them is so much more cogently supported by evidence than the others as to support belief beyond reasonable doubt that it is the fact.

Respondents argue that the facts of this case are quite similar to the facts in *Joseph v. Fair*, 763 F.2d 9 (1st Cir.1985), in which the First Circuit denied habeas relief to an individual convicted of armed robbery who claimed that the circumstantial evidence against him was insufficient under the *Jackson* standard. Although there are some similarities between the two cases, the evidence against Joseph was far stronger than the evidence against petitioner.

In *Joseph*, the evidence was that two men, one masked and holding a knife and one not masked and carrying a shotgun, robbed a store. Thirty-three hours after the holdup, Joseph and the man identified as the unmasked robber were found together in a wooded area behind a motel. Joseph had in his possession a knife, identified as similar to the one held by the masked robber, and a green woolen ski mask, which Joseph admitted was his, and which was identified as the one worn by the masked robber. A shotgun, matching the description given by the robbery witnesses, was found thirty-four feet from the spot where Joseph was apprehended. Joseph had shotgun shells in his possession of the same make and gauge as the one found loaded in the shotgun.

Joseph's height and build substantially fit the description of the masked robber. The court stated:

Although [the] witnesses obviously were not able to identify the masked robber's face, the jury could have reasonably compared that robber's description with Joseph's physical appearance in finding that the petitioner was the masked robber alleged by the prosecution.

*Joseph*, 763 F.2d at 10. As stated earlier, petitioner's jury could have found that he matched the general description supplied by the Zayre employees. However, in *Joseph* the match between the defendant and a general description was just one small part in a much more compelling web of circumstantial evidence than was before the jury in this case.

Perhaps the most striking difference between the strength of the two cases is that Joseph was found in actual possession of items used in the robbery. By contrast, the prosecution in this case relied on evidence of constructive possession to link petitioner to the incriminating items. It is true that Joseph's link to the shotgun was somewhat speculative, yet nevertheless the court concluded that "Joseph's link to the shotgun in question was close enough as to allow jurors to reasonably connect the petitioner to the commission of the offense." *Id.* However, evidence linking Joseph to the shotgun was just a fairly minor part of the government's evidence against him— evidence which included the fact that Joseph was arrested less than a day and a half after the robbery, in the woods, in the

company of the other robber, with the knife and ski mask (which he admitted was his) in his actual possession. By contrast, the evidence constructively linking petitioner to the incriminating items, along with the fact that he matched the robber's general description, comprised virtually the entire case against petitioner.

Nevertheless, although this is a close case, I conclude that the evidence on the record is sufficient for a rational jury to find petitioner guilty of the robbery beyond a reasonable doubt. The evidence before the jury probative of petitioner's guilt was (1) that the robber was 5'10" to 5'11" with a slim build and brown eyes, (2) that, on the day of the robbery, petitioner and Pacek rented an apartment and Pacek gave Antinarella an envelope with petitioner's name on it containing two months rent in the sum of $250, (3) that petitioner and Pacek were given a key to the apartment and planned to move a few things in right away, (4) that petitioner and Pacek were the persons who were to live in the apartment after the painting and other work was done by members of Pacek's family, and (5) that, three days after the robbery, items used in the robbery were found in the apartment, behind a false wall in a closet adjacent to the living room and under styrofoam in the bedroom.

From these facts the jury could have reasonably inferred that petitioner had free access to the apartment from the time that the key was delivered to him and Pacek and that they together exercised control over the apartment during the next three days. The jury could also have inferred that it is unlikely that the incriminating items would have been placed in the apartment by someone other than petitioner without petitioner's knowledge and consent. Combining this inference with the evidence concerning the $250 and the robber's general description, I conclude that a reasonable jury could find, beyond a reasonable doubt, that petitioner possessed the items found in the apartment.

Petitioner argues that, even if the evidence of possession was sufficient, a rational jury could not infer beyond a reasonable doubt that he was actually the robber and not merely an accessory after the fact. Petitioner cites strong precedent for the proposition that the inferences that can be drawn from "mere possession" are very limited. *See, e.g., Cosby v. Jones,* 682 F.2d 1373, 1381 (11th Cir.1982) ("We have found no case ... sustaining the sufficiency of the evidence to convict for actual commission of theft, burglary or robbery where the prosecution's case rested on the bare inference of guilt from possession [of stolen goods]"). However, this is not a case of mere possession of the implements of a robbery. The jury also had before it the evidence of the robber's general description and the evidence concerning the $250. Although both of these pieces of evidence are quite weak standing alone, when combined with the possession they provide sufficient basis for a jury to conclude beyond a reasonable doubt that petitioner did not merely possess the items but in fact used them to commit the robbery.

### ORDER

For the foregoing reasons, it is ORDERED:

(1) Petitioner's Request for Oral Argument (Docket No. 24) is denied.

(2) Petitioner's Petition for Writ of Habeas Corpus (Docket No. 3) is denied.