UNITED STATES of America, Plaintiff,

v.

Paul GREYSHOCK, Mike Stewart, Larry Landis, and Scott Davidson, Defendants.

Nos. CR 88–01778–01 to CR 88–01778–04 (DAE) (SC).

United States District Court, D. Hawaii.

March 14, 1989.

Louis A. Bracco, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff.

Brook Hart, Honolulu, Hawaii, for Greyshock.

William Harrison, Honolulu, Hawaii, for Stewart.

Thomas Murphy, Asst. Fed. Public Defender, Honolulu, Hawaii, for Landis.

John Ashford Thompson, Honolulu, Hawaii, for Davidson.

## ORDER

CONTI, District Judge.

In December of 1988, defendants Paul Greyshock, Mike Stewart, Larry Landis, and Scott Davidson, along with Christopher Mussell, were taken on board the U.S. Coast Guard cutter Jarvis, approximately 600 miles northeast of Oahu, Hawaii. Four federal law enforcement agents were aboard the Jarvis to assist in a possible interdiction of Greyshock's vessel, known as the Mai Tai Maru or the Iho Maru, which was suspected as being part of a marijuana smuggling operation. The defendants move to suppress the confessions they made aboard the Jarvis, maintaining that (1) these confessions were involuntarily made and their waivers were the product of coercion; and (2) there was unnecessary delay in bringing defendants before a magistrate for arraignment. Defendants also move to dismiss the indictment, alleging that 46 U.S.C.App. § 1903, the Maritime Drug Law Enforcement Act ("the Act"), is unconstitutionally vague and operates as an *ex post facto* law. Defendants also move to dismiss the indictment on jurisdictional grounds, alleging that the Cook Islands, the flag nation of the vessel Iho Maru, has not consented to the prosecution of this lawsuit. Defendant Greyshock also moves to dismiss the indictment on the grounds that the government in bad faith destroyed the alleged crime scene.

A jurisdictional hearing and a six day suppression hearing were held on these matters. After carefully considering the parties' briefs, and the evidence presented at the hearings, the Court finds that the confessions were voluntarily made and were not the product of coercion, and that defendants knowingly and voluntarily waived their Fifth Amendment rights. In addition, the Court finds that the delay between arrest and arraignment was not unreasonable, and that the confessions should not be suppressed on that ground. The Court also finds that jurisdiction is proper, in that consent was given by the Cook Islands pursuant to 46 U.S.C.App. § 1903(c). The Court also denies defendants' motions to dismiss based on their attack on the Act's alleged unconstitutionality, finding that the Act is constitutional. Finally, the Court finds that the Iho Maru and its contents were not destroyed in bad faith.

## FACTUAL BACKGROUND

On the morning of December 7, 1988, approximately 600 miles northeast of Oahu, the Jarvis sighted the vessel known alternatively as either the Iho Maru or the Mai Tai Maru. The vessel and its crew were suspected of being involved in a marijuana smuggling operation, and for several hours the Jarvis attempted to make radio and other contact with the vessel. The Iho Maru did not respond to these attempted contacts. Approximately five hours later, the Iho Maru caught fire and its crew, defendants Greyshock, Stewart, Landis, and Davidson, and Mussell, donned life pre-

servers and abandoned ship. The Jarvis dispatched a small life boat, picked up the men, and brought them aboard the Jarvis.

Defendants were given blankets, coveralls, and boots upon boarding the Jarvis, and at some point soon thereafter were given heavy foul-weather jackets. After the defendants changed into dry clothing, they were individually questioned by one or two of the federal agents. Before the questioning, each defendant was orally advised of his rights as required under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Each defendant was also given a written "Advice of Rights" form, which sets out the *Miranda* warnings and provides for a place to sign indicating that the defendant is waiving these rights and is willing to make a statement and answer questions. Each defendant signed the waiver form, and answered questions posed by the agents. At this point, Christopher Mussell made a full confession.[1] Thereafter, the defendants were fed, and the medic aboard the Jarvis, Mike Caruso, examined each defendant and found no medical problems. That evening, defendants were given air mattresses and slept on the flight deck of the Jarvis. The evidence shows that the air temperature that evening was between 60–70 degrees.

On December 8, 1988, based in part on Mussell's confession the previous day, the defendants were placed under arrest. They were shackled by one leg to the flight deck, approximately 20 feet from one another, and were instructed not to speak with one another. Defendants were escorted to and from the bathroom. The defendants were given three meals a day, and were fed the same food as the Jarvis crew. They were also provided with cigarettes and coffee. On the night of December 8 it began to rain, and the defendants were brought into a covered area on the deck of the boat called the "air castle." Defendants were given gym mats to sleep on, as the air mattresses they had earlier been given had deflated.

On December 9, the Coast Guard firefighting team attempted to board the Iho Maru. At this point, Greyshock executed a written consent to search and take custody of his vessel. However, the fire burned so intensely that no one could board the ship. On December 10, the Iho Maru, still on fire, was taken under tow by the Jarvis towards Honolulu. At this point, the vessels were still approximately 600 miles northeast of Oahu. The next day, the defendants were brought below deck on the advice of the ship medic, to take them out of the direct sunlight.

The evidence indicates that on December 12, Greyshock informed F.B.I. Agent Vince McNally that he wanted to talk to the agents and attempt to work out a deal with them. When Greyshock was brought to the agents, he was told by the agents that they did not have the authority to make any "deals" with him, and that only the United States Attorney had that authority. Greyshock was presented with a form entitled "Written Waiver of Rights to be Taken Before a Federal Magistrate and to Have Counsel." Greyshock signed the form, which states that "I told the FBI Agent that I waive (give up) these Rights because I want to immediately cooperate with the FBI ..." Greyshock crossed out the portion of the form which states that "I also feel that I do not need the assistance of a lawyer to advise me. In addition, I do not want to talk to a lawyer until after my cooperation with FBI is over." Greyshock then made a statement to the agents in which he implicated himself and his crew in a marijuana trafficking scheme, but did not divulge to the agents the identity of the main "financier" of the entire operation. This meeting lasted approximately one hour. After dinner, Greyshock was again orally advised of his *Miranda* rights, and was presented with a written "Advice of Rights" form. Greyshock signed the waiver portion of this form. He was asked to repeat his story, and notes were taken of this interview.

---

1. Mussell has entered a voluntary plea of guilty to the offense of possession with intent to distribute in excess of 500 kilograms of marijuana in violation of Title 46, United States Code App. § 1903 and Title 21, U.S.C. § 960(b).

On December 13, Greyshock asked to speak with the members of his crew, and was given permission to do so. Thereafter, Greyshock advised the agents that the members of his crew were also willing to make statements. Each defendant was then individually given the *Miranda* warnings orally, and was presented with an "Advice of Rights" form. Each of the crewmembers signed the waiver portion of these forms, and made statements to the agents. Greyshock was then called back to talk with the agents. He was given a copy of the agent's notes, taken during Greyshock's earlier statement, which the agent had prepared into narrative form. Greyshock read the narrative and made some corrections to it. The agent then typed the notes up several hours later, and showed this to Greyshock. Greyshock did not sign this typed version of his confession, and the agent noted on the signature line that Greyshock "refused to sign until contact his lawyer (sic) however he read it and made corrections on page 1." Page one has several corrections on it.

At this point, on December 13, the Iho Maru was still in tow, and was burning badly. The intense fire made it impossible for a fire-fighting team to safely board the vessel. Coast Guard officials were advised that the burning vessel would not be allowed into the port of Honolulu, as the ship posed an environmental hazard. The Coast Guard also felt that the burning ship presented a navigational hazard. On December 12 Greyshock had given written permission to destroy the vessel. Therefore, the Coast Guard cutter Jarvis sunk the Iho Maru by firing its guns into the vessel. Nothing was salvageable from the Iho Maru.

Without towing a burning vessel, the Jarvis was now able to move towards Honolulu at a faster pace. At this point, defendant Davidson complained of severe chest pains, and the medic aboard the Jarvis recommended that Davidson be med-evaced to Honolulu. A Coast Guard helicopter flew Davidson to the nearest hospital. The Jarvis continued towards shore, and arrived in the port of Honolulu in the morning of December 15, 1988. That afternoon all defendants, including Davidson, who had been treated and released from the hospital, were brought before a federal magistrate.

## ANALYSIS

### SUPPRESSION MOTIONS

The defendants claim that their confessions were involuntary and that their waivers were the product of coercion, in violation of their Fifth Amendment rights, and also that there was unnecessary delay in bringing them before a magistrate, in violation of Federal Rule of Criminal Procedure 5(a) and 18 U.S.C. § 3501. The government bears the burden of proving by a preponderance of the evidence that the defendants' confessions were voluntarily made, i.e., that the confessions are "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986); *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Defendants' waivers of their Fifth Amendment rights must not have been the product of police overreaching, *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and the totality of the circumstances must be analyzed in making this determination. *Crane v. Kentucky*, 476 U.S. 683, 688, 106 S.Ct. 2142, 2145, 90 L.Ed.2d 636 (1986). The Court finds that defendants were not coerced, intimidated, or deceived into waiving their Fifth Amendment rights, and that their confessions were voluntarily made. The Court also finds that the delay in bringing the defendants before a magistrate was reasonable.

### 1. Fifth Amendment Analysis

The government has presented uncontroverted evidence that the defendants were given dry clothing, three meals a day, coffee, cigarettes, and daily medical attention. None of the defendants ever required more than aspirin, except defendant Davidson who was immediately flown to shore upon complaining of chest pains. The evidence also indicates that the defendants were ad-

vised of their Fifth Amendment rights, both orally and on paper, whenever substantive interviews occurred between the defendants and the federal agents, and that the defendants understood and waived these rights.

■ The fact that the defendants were secured by leg chains to the deck or air castle of the Jarvis, the fact that they had been exposed to salt water, and the fact that they had to request permission to use the restroom and had to be escorted back and forth from it, do not render defendants' confessions involuntary. The evidence indicates that although the defendants were not in comfortable surroundings, their discomfort was inherent in the fact that they were in custody aboard the Jarvis, a military vessel, after being picked out of the sea at a point some 600 miles away from shore. Although of course these facts do not diminish defendants' discomfort, they make it more likely that the situation was not perceived by the defendants as threatening, and that they did not feel themselves to be at the mercy of their guards. The totality of the circumstances indicates that defendants' situation was not the product of governmental coercion, but was instead inherent in the fact that they were arrested for a serious crime in the middle of the ocean, and posed a security risk to the military vessel in which they were being transported. *Cf. United States v. Yunis,* 859 F.2d 953, 962 (D.C.Cir.1988). The reasons for defendants' discomfort, therefore, weigh into the analysis of whether defendants were "intimidated, coerc[ed], or dec[eived]" into confessing.

■ The government has shown by a preponderance of the evidence that defendants' waivers of rights were knowing and voluntary. Defendants assert that by signing the waivers, they thought that they were asserting their rights rather than waiving them. Defendants support this claim by stating that they are not trained in the law and therefore cannot be found to have "knowingly" waived their rights. Legal training is not a prerequisite for a valid waiver of rights. See *United States v. Doe,* 819 F.2d 206, 209 (9th Cir.1985). The

evidence indicates that defendants were repeatedly advised of their rights, stated that they understood those rights, read the written statements of those rights, and signed the waiver forms.

■ Defendant Greyshock, in crossing out the "waiver of attorney" portion of the "Waiver of Right to be Taken Before a Magistrate" form, was at best making an ambiguous request for counsel. When such ambiguity is present, the court must analyze the surrounding circumstances in interpreting such a request. *See Grooms v. Keeney,* 826 F.2d 883, 886 (9th Cir.1987). Agent McNally testified that Greyshock told the agents that although he wished to speak with them at that time, he wanted to preserve his right to have a lawyer later. This is consistent with the fact that the line which Greyshock crossed out on the "magistrate waiver" form states that "I also feel that I do not need the assistance of a lawyer to advise me," whereas the waiver which Greyshock did sign states that "I do not want a lawyer at this time." When viewed in light of the fact that it was Greyshock who initiated this meeting, that he told the agents that when they reached Honolulu he wanted a lawyer, to assist him in working out a deal with the United States Attorney, and that he went on to give the agents a statement, the Court finds that Greyshock was not asserting his Fifth Amendment right to counsel when he crossed out the "waiver of counsel" portion of the form.

### 2. Delay in Appearance Before a Magistrate

■ Nine days elapsed between the time that the defendants were taken aboard the Jarvis and the time that they were brought before a magistrate. Federal Rule of Criminal Procedure 5(a) requires that an arrested person be brought before a federal magistrate "without unnecessary delay." 18 U.S.C. § 3501(c) states that a court may consider "the means of transportation and the distance to be traveled to the nearest available such magistrate ..." in determining whether a delay was reasonable.

Defendants maintain that they should have been air-lifted to a magistrate, or that they should have been permitted to use the Coast Guard radio equipment to contact a magistrate, and that their confessions should be suppressed on this ground. The Court finds that because the Jarvis proceeded directly to Honolulu upon taking the defendants on board (with an initial delay as the Coast Guard attempted to extinguish the fire on defendants' vessel), the delay was reasonable and that the means suggested by defendants were not necessary. *See United States v. Yunis,* 859 F.2d at 967 (D.C.Cir.1988); *U.S. v. Purvis,* 768 F.2d 1237, 1238 (11th Cir.1985).

## MOTIONS TO DISMISS

Defendants move to dismiss the indictment on a number of grounds: that this Court is without jurisdiction in that 46 U.S. C.App. § 1903 is unconstitutional; that defendants' due process rights were violated because by sinking the Iho Maru, the government intentionally destroyed potentially exculpatory evidence; and that this court is without jurisdiction in that the Cook Islands has not consented to the prosecution of this lawsuit in the United States. Defendant Greyshock also moves to dismiss the indictment on the grounds that the government intentionally destroyed the Iho Maru, thus making it impossible for Greyshock to defend against the crime of arson which he is charged with. For the reasons that follow, the Court denies these motions to dismiss the indictment.

### 1. Destruction of Evidence

 On December 13, 1988, the United States Coast Guard sank the burning vessel the Iho Maru. The Coast Guard determined that the vessel, as an environmental hazard, would not be allowed into the port of Honolulu, and that if the vessel was left to burn it would pose a navigational hazard. The Coast Guard initially had attempted to board the burning vessel to extinguish the fire, but had to leave it as the fire was burning too intensely. Other attempts to extinguish the fire failed. The Jarvis towed the burning vessel for several days before it was determined that the ship would be sunk.

The Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* —— U.S. ——, ——, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988). Defendants claim that there was lobster line on the vessel, and that the Coast Guard's sinking of the boat therefore denied them of their constitutional right to potentially exculpatory evidence. Greyshock claims that the ship's interior would have indicated that the ship had not been intentionally set on fire, and would therefore have provided him with a defense to the arson charge. The Court finds that there was no bad faith involved in the sinking of the Iho Maru. Greyshock had executed written permission for the Coast Guard to sink the hazardous vessel. The Coast Guard had first attempted to extinguish the fire, and had attempted to tow the ship to port. The Court finds that the decision to sink the vessel was made for safety and environmental purposes, and defendants' motions to dismiss on these grounds are without merit.

### 2. Constitutionality of the Act

Defendants claim that 46 U.S.C.App. § 1903, the Maritime Drug Law Enforcement Act, is unconstitutionally vague and operates as an *ex post facto* law. The Court finds these contentions also to be without merit.

 An "ex post facto law" is a law which renders an act criminal which was innocent before passage of the law. *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). The defendants' alleged conduct was not innocent before the Cook Islands consented to the boarding of their vessel. The Act does not operate *ex post facto. See U.S. v. Mena,* 863 F.2d 1522, 1528 (11th Cir.1989); *U.S. v. Alomia–Riascos,* 825 F.2d 769, 772 (4th Cir.1987); *U.S. v. Gonzalez,* 776 F.2d 931, 938 (11th Cir.1985).

 Nor is the statute void for vagueness. The due process clause of the fifth

amendment requires that fair notice be given regarding what conduct is violative of the law. The statute gives clear notice as to the types of conduct which will be held to violate its terms. 46 U.S.C.App. § 1903(a); *see U.S. v. Mena,* 863 F.2d 1522, 1527 (11th Cir.1989); *U.S. v. Smith,* 680 F.2d 255, 258 (1st Cir.1982); *see also U.S. v. Gomez–Tostado,* 597 F.2d 170, 172 (9th Cir.1979).

### 3. Jurisdiction: Cook Islands Consent

Defendants move to dismiss the indictment, alleging that there is no "subject matter jurisdiction over the Iho Maru and its crew." Defendant Stewart's Memorandum in Support of Motion to Dismiss, at 2. Defendants maintain that the Cook Islands, the flag nation of the Iho Maru, did not "consent" within the meaning the Maritime Drug Law Enforcement Act, and that therefore the Iho Maru is not a "vessel subject to the jurisdiction of the United States" as required by 46 U.S.C.App. § 1903(a). For the reasons stated below, the Court makes the following findings: the Cook Islands did consent to the boarding, search, and seizure of the Iho Maru, for evidence "which may relate to any prosecution under the laws of the Cook Islands or of the United States;" the defendants do not contest that this consent was indeed given; as a matter of law, this consent constitutes "consent" as contemplated in the Act, 46 U.S.C.App. § 1903(c)(1)(C); this consent was given prior to the prosecution of this case, thus conferring jurisdiction; and the debate over whether "consent" is a matter of law or fact is irrelevant in this case, since the evidence which defendants themselves submit as constituting the "actual" consent given by the Cook Islands constitutes "consent" within the meaning of the Act.

The Maritime Drug Law Enforcement Act states that

It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

46 U.S.C.App. § 1903(a). The Act defines a "vessel subject to the jurisdiction of the United States" as including

a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States.

46 U.S.C.App. § 1903(c)(1)(C). The Act further provides that "consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States may be obtained by radio, telephone, or similar oral or electronic means, and may be proved by certification of the Secretary of State or the Secretary's designee." 46 U.S.C.App. § 1903(c)(1).

The government asserts that the Cook Islands, the flag nation of the Iho Maru, consented to the enforcement of United States law, as contemplated by the Act. The government supports this by offering the Declaration of Jonathan M. Vaughn, the designee of the Secretary of State. Vaughn's declaration states that the Honorable Norman George, Minister of Foreign Affairs of The Cook Islands, who has the authority to consent to the enforcement of law against vessels of its nationality by other nations, consented to United States officials boarding and searching the Mai Tai Maru, and seizing narcotics and any other evidence on board which may assist in a prosecution pursuant to the laws of the United States. The official United States seal of the Secretary of State accompanies this declaration.

The defendants quarrel with this consent as a basis for jurisdiction, claiming that § 1903(c)(1)(C) requires that "consent to prosecute" be specifically given by the flag nation, and that this consent was not given. Defendants claim that Vaughn's declaration does not provide support for finding such "consent to prosecute," and that if it does, then Vaughn incorrectly stated the consent actually given by the Cook Islands Minister of Foreign Affairs, the Honorable Norman George.

█ Defendants' arguments turn on the definition of "consent" under 46 U.S.C. App. § 1903(c)(1)(C). The Court finds that

this is a question of law, to be determined by the Court.[2] The Act states that a "vessel subject to the jurisdiction of the United States includes ... a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States." The Act does not specify what particular words are necessary to establish such consent, but does state that consent or waiver of objection by a foreign nation "may be obtained by radio, telephone, or similar oral or electronic means."

■ Courts have held a variety of phrases sufficient to establish "consent" and to confer United States jurisdiction over foreign vessels. *See United States v. Peterson*, 812 F.2d 486, 493 (9th Cir.1987) (flag nation telex stating that Panamanian government was authorizing the U.S. Coast Guard to "board, search and seize subject vessel on their behalf if evidence warrants this action" held sufficient "consent" to confer jurisdiction); *United States v. Alomia–Riascos*, 825 F.2d 769, 770 (4th Cir. 1987) (flag nation consented by stating that it "had no objection if the government of the United States of America seizes the [subject vessel] in accordance with United States law ... and institutes proceedings against it in accordance with United States law"); *United States v. Aikens*, 685 F.Supp. 732, 741 (D.Hawaii 1988) (court held that consent "to board and search" was *broader* consent than consent "to the enforcement of United States law by the United States"). The Court finds that neither the statute itself nor the case law supports defendants' claim that under the Act, the flag nation must specifically state that the United States has its "consent to prosecute." The Act was passed in part to ensure that drug traffickers would not

evade prosecution simply because a formal treaty did not exist between the United States and the flag nation of the offender's vessel. The Court therefore finds that the consent attested to by Vaughn in his declaration, i.e., that the United States had Cook Islands authority to board, search, and seize the vessel and other evidence which may assist in prosecution pursuant to United States laws, is sufficient to confer jurisdiction under 46 U.S.C.App. § 1903(a).

■ Defendants' motion to dismiss must also be denied based on their argument that Vaughn did not accurately state the consent actually given by the Cook Islands. Defendants claim that the actual consent given by the Honorable Norman George, Cook Islands Minister of Foreign Affairs, does not support that part of Vaughn's declaration which states that the Cook Islands consented to "application of United States law" against the Iho Maru. Defendants support this by offering a letter written by George to Paul Cleveland, U.S. Ambassador. Defendants claim that this letter, which authorizes

> officials of the United States Government to board the Mai Tai Maru for the purpose of conducting a search for narcotics and other evidence which may relate to any prosecution under the laws of the Cook Islands or of the United States in relation to the same ... [and] further authorize[s] officials of the United States Government to seize any narcotics and other evidence found on board said vessel, which may assist in a prosecution pursuant to Cook Islands law or the laws of the United States of America,

does not constitute consent to prosecute defendants under United States laws.

2. *Compare U.S. v. Mena*, 863 F.2d 1522, 1532 (11th Cir.1989) (Court found that although the issue of consent was not specifically presented to the jury, as a matter of law, the Honduran document which granted consent to board and exercise jurisdiction over the vessel was sufficient "consent" under the statute); *U.S. v. Alomia–Riascos*, 825 F.2d 769, 771 (4th Cir.1987) (consent "is not a jurisdictional requisite or an essential element" of the statute, but must merely be established "to the satisfaction of the trial court"); *U.S. v. Gonzalez*, 776 F.2d 931, 940

(11th Cir.1985) ("consent" not an element which must be proved to the jury); *with U.S. v. Ayarza–Garcia*, 819 F.2d 1043, 1048–9 (11th Cir.1987) (where defendants raise objections which go to the sufficiency of the evidence establishing consent, the question is one for the jury). *Ayarza–Garcia* is inapposite in this case, as defendants admit that the Cook Islands authorized the Coast Guard to board, search, and seize evidence of narcotics that may relate to or assist in the prosecution of violations of Cook Islands or United States law. See note 3, *infra*.

The Court finds that defendants' arguments concerning the differences between the Vaughn declaration and the George letter are not relevant to the issue of whether consent was given. The Court has found, *supra*, that as a matter of law consent to "board, search, and seize evidence which may assist in prosecution pursuant to United States law" is sufficient to establish "consent" under the Act. George's letter, offered by the defendants, gives such consent. Therefore, there is no factual controversy in this case relevant to the issue of consent.[3]

 The Court also rejects defendants' argument that the Cook Islands was actually *maintaining* jurisdiction to prosecute the defendants. Defendants offer no legal support for this position. Nor do either the Vaughn declaration or the George letter indicate that the Cook Islands was somehow "reserving" jurisdiction and mandating that the United States not bring the defendants to trial. Moreover, the Court finds that defendants have no standing to raise such an argument, in that 46 U.S.C. App. § 1903(d) states that "a claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter." *Cf. U.S. v. Alomia–Riascos*, 825 F.2d 769, 771 (4th Cir.1987) (Court found that flag nation consent "is simply a diplomatic requisite that must be met," and the consent requirement is merely a "courtesy to other nations" and not a jurisdictional requisite or essential element of the crime.)

## CONCLUSION

In accordance with the foregoing, IT IS HEREBY ORDERED that:

(1) Defendants' motions to suppress are denied; and

(2) Defendants' motions to dismiss are denied.

SO ORDERED.

---

**3.** Defendants concede that the Cook Islands authorized the Coast Guard to board, search, and seize evidence of narcotics that may relate to or assist in the prosecution of violations of Cook Islands or United States law. *See* Defendant Stewart's Memorandum of Law in Support of Motion to Dismiss, at 3–4.